**UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA**

SALIM QAZIZADEH     :
   Plaintiff,     :
            :
 v.          :
           : CASE NO. 1:14-CV-2037
PINNACLE HEALTH SYSTEM and :
PINNACLE HEALTH MEDICAL  :
SERVICES,       :
   Defendants.    :

*M E M O R A N D U M*

   Plaintiff brings a state-law cause of action for breach of contract and also raises a claim under Pennsylvania's Wage Payment and Collection Law ("WPCL"). Plaintiff's lawsuit stems from his suspension without pay and eventual termination from Defendants' employ.  Pending is Plaintiff's motion for summary judgment.

   *I.* *Background*

   *A. Procedural History*

   On October 22, 2014, Plaintiff initiated this lawsuit by filing a civil complaint. (Doc. 1).  The complaint has since been amended three times.

   In the third-amended complaint (Doc. 26), filed on November 12, 2015, Plaintiff originally brought claims pursuant to 42 U.S.C. § 1981; the Pennsylvania Human Relations Act ("PHRA"); and Title VII of the Civil Rights Act of 1967 ("Title VII").  Also, Plaintiff originally set forth an allegation of willful, outrageous, and / or reckless conduct in violation of his rights under Title VII and the PHRA.  Plaintiff further brought a state-law claim for breach-of-contract and a claim under the WPCL.  On April 4, 2016, however, the Court granted the parties' joint motion (Doc. 33) for dismissal of (1) the allegation of willful, outrageous and reckless conduct and (2) all discrimination-based claims.  (Doc. 40).  Thus,

Plaintiff's breach-of-contract claim and the claim arising under the WPCL are all that remain. For remedies, Plaintiff requests compensatory and punitive damages, as well as costs and attorney's fees.

On November 20, 2015, Defendants answered the third-amended complaint. (Doc. 27).  Subsequently, on March 31, 2016, after conducting discovery, Plaintiff filed the pending motion for summary judgment that is ripe for review.

### B. Facts

Unless signaled otherwise, the following facts are taken from the parties' submissions in connection with this motion.  The facts are also supplied in accordance with the summary-judgment legal standard, *infra*.

Plaintiff, a Board Certified Neurologist, currently resides in the Commonwealth of Virginia.  (Doc. 37 at ¶ 1; see Doc. 1 at ¶ 3; Doc. 26 at ¶ 3).  Defendant Pinnacle Health Medical Services ("PHMS") is an entity within Defendant Pinnacle Health Systems ("PHS").  (See Doc. 36 at 1, n.1).  Defendants are non-profit corporations licensed and authorized to do business in the Commonwealth of Pennsylvania, where their primary place of business is also located.  (See Doc. 26 at ¶¶ 4-5).

In July 2006, Plaintiff began employment with Defendants as a Neurologist. (Doc. 47 at 7).  Five years later, on August 31, 2011, Plaintiff got married.  (See id. at 11).  Shortly after Plaintiff's marriage, he and his wife started to have marital problems, and, on September 28, 2011, Plaintiff was arrested following a domestic dispute.  (Id. at 12, 34, 69; see Doc. 47-1 at 6).  The day after he was arrested, Plaintiff did not show up to work, and Nicole Purcell ("Purcell"), Defendants' Medical Director (or head) of Neurology, was alerted by a hospital answering service that Plaintiff was not returning calls.  Also, Purcell could not

reach Plaintiff.  (Doc. 47-1 at 51, 56).   Eventually, however, Purcell received a phone call from Plaintiff's wife who stated that Plaintiff was not coming to work because he was in jail. Plaintiff's wife also informed Purcell that Plaintiff had tried to kill her with a knife.  (Id. at 56).

On September 30, 2011, Plaintiff was suspended without pay pending review of the criminal charges filed against him, in accordance with HR Policy #6.1, "Criminal Background Checks and Offenses."  (Id. at 71).   Thereafter, Plaintiff entered into an Accelerated Rehabilitative Disposition ("ARD") Program in which he was required to attend "marital dispute" classes.  (Doc. 47 at 13).   He was also sentenced to probation through January 2013.  (Doc. 47-1 at 6; see Doc. 47-2 at 7).  By November 2011, Plaintiff had been terminated from Defendants' employ.  (Doc. 47-2 at 16).

One year later, near the end of 2012, Defendants were having a difficult time recruiting physicians in the Neurology Department.  As such, Defendants recruited Plaintiff for re-employment.  (Doc. 47-2 at 23).  During the recruitment process, Plaintiff spoke with Nirmal Joshi ("Joshi"), Defendants' Chief Medical Officer and Senior Vice President of Medical Affairs.  (Doc. 47 at 23).  On at least one occasion, Plaintiff also met with Thomas Stoessel ("Stoessel"), Defendants' Senior Vice President of Business Development.  (Doc. 47-2 at 50).  Stoessel shared with Plaintiff concerns about his prior behavior that had kept him from showing up for work.  (Id. at 50-51).  Stoessel also shared with Plaintiff some concerns that other neurologists had about him.  (Id. at 51).  Based on those various concerns, it was further expressed to Plaintiff that, if he returned to work with Defendants, he would be on a "very short leash."  (Doc. 47-2 at 22).

On January 21, 2013, Plaintiff agreed to return to work for Defendants and entered into a Physician Employment Agreement ("PEA") that had been drafted by

Defendants.  (Doc. 37 at ¶¶ 3, 4).  According to Plaintiff, there was nothing in the PEA that was inconsistent with what Stoessel had discussed with him.  (Doc. 47 at 35).  Two weeks after signing the PEA, Plaintiff also signed an Employee Handbook Acknowledgment, in which he acknowledged his responsibility to review and become familiar with the Handbook, the Administrative Policies and Procedures, the Human Resources Policy and Procedure Manual, the Safety Manual, the Privacy and Security Manual and his department's policies and procedures.  (Doc. 47-3 at 54).

Regarding the terms of the PEA, Plaintiff was required to report to Stoessel or a designated administrator of the Neurosciences Program.  Clinical issues were to be addressed by Joshi.  (Doc. 37 at ¶ 5; Doc. 47-2 at 20; Doc. 47-3 at 40, 61).  The PEA also provided that Plaintiff "[would] be scheduled for appointments and coverage by the head of neurology and [would] be expected, absent cause or consent by the head of neurology, to provide the required services during scheduled work times."  (Doc. 47-3 at 40).  PHMS could terminate the PEA for cause, if, *inter alia*, Plaintiff "[c]ancell[ed] scheduled appointments without proper cause and consent from the head of neurology[.]"  (Id. at 43).  These two clauses were specially added to the PEA out of concern about Plaintiff not showing up for work as scheduled.  (Doc. 47-2 at 50; cf. Doc. 53-3 at 1-2, 8-9).

The PEA additionally provided, in pertinent part, as follows:

4.  Physician shall comply with the Bylaws, Rules and Regulations of the Medical Staff of PHH and with all state and federal laws and regulations governing hospital operations and the practice of medicine.  Physician shall also comply with all of PHS's Human Resources Policies and Procedures and PHS's Administrative Policies and Procedures, including, but not limited to, its Corporate Compliance policy.

14. This Agreement is effective as of February 5, 2013, and shall continue for a term ending February 4, 2015, unless earlier terminated as follows:

4

. . .

    b. Immediately upon the occurrence of any of the following events:

        (1) Physician's conviction of any misdemeanor or felony or of any crime enumerated under the Pennsylvania Older Adults Protective Services Act.

. . .

    c. PHMS may terminate . . . for cause, which shall include:

        (1) Breach by Physician of any material term of this Agreement; or

        (2) The failure by Physician to perform Physician's duties; or

        (3) Consistently poor performance of Physician's duties; or

. . .

        (5) The consistent failure by Physician to attain assigned objectives; provided, however, PHMA provides Physician with specific written notice of the breach and provides Physician with no less than [30] days to correct the same.

    d. Physician or PHMS may terminate this Agreement at any time and without cause by giving [180] days prior written notice of termination to the other party.  In its sole discretion, PHMS may terminate Physician's services hereunder during the notice period, provided that Physician shall be entitled to the continuation of compensation and benefits during such notice period.

16. Any notice required or permitted to be given under this Agreement shall be sufficient if such notice is in writing and is delivered in person or mailed by registered or certified mail, return receipt requested and postage prepaid.  In the case of notice to PHMS, said notice shall be sent to the address set forth above and to the attention of the Senior Vice President of Medical Affairs.  In the case of notice to Physician, the said notice shall be sent to the Physician's then current residential address on file in the Department of Human Resources.

19.   This Agreement contains the entire agreement of the parties, supersedes any prior or existing agreements of the parties and may not be amended, waived or modified except in writing, signed by the parties. The waiver by a party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach. This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania.  . . .

23.  Physician represents and warrants that Physician has not assumed any obligation and will not in the future assume any obligation which will prevent or interfere with Physician's performance under this Agreement. Physician further represents and warrants that Physician, in entering into this Agreement, is not in violation of a restrictive covenant entered into with any other person or entity.

(Doc. 47-3 at 40, 43-44).

Additionally, in February 2013, Defendants' Human Resources Policy No. HR-6.1(E) ("HR # 6.1(E)") provided:

**E. Criminal Acts**

1. Pinnacle Health System may suspend an employee, without pay or benefits, if the employee is charged with a criminal offense regardless of whether the matter giving rise to the filing of the charge occurs during the time that the employee is providing services to Pinnacle Health System. The decision by Pinnacle Health System whether to suspend an employee who has been charged with a crime shall be based upon the circumstances surrounding the employee's arrest, the nature of the charge, and the job responsibilities of the employee.  The decision shall be made by the employee's manager in consultation with the Director of Employment and Labor Relations or designee.

2.   The suspension shall remain in place pending final review of the charges by Pinnacle Health System which may, but need not, occur after resolution of the criminal charge.

a. Following Pinnacle Health System's final review of the criminal charge the employee may be discharged from Pinnacle Health System's employ or be reinstated.   In making this determination, Pinnacle Health System shall determine whether the employee's conduct leading to the arrest is inconsistent with acceptable standards of behavior and directly reflects upon the employee's ability to perform the employee's assigned duties.

b. If an employee is convicted [of certain offenses] the employee shall be discharged from Pinnacle Health System's employ.

3. An employee must notify the employee's manager if the employee is charged with or convicted of one of [certain offenses] or any other State or Federal crime.  Notification must be given to the manager within [24] hours of the filing of the criminal charge or from the time that the employee is informed of the conviction.  Failure to inform the employee's manager shall result in termination of employ.

(Doc. 47-5 at 36, 37).

On February 5, 2013, Plaintiff began his second stint working for Defendants, in accordance with the PEA.   (Doc. 38-1 at ¶ 5; see Doc. 47-5 at 18). Approximately nine days later, however, Plaintiff was charged with three misdemeanors: recklessly endangering another person; simple assault; and terroristic threats.  (Doc. 38-7). The charges were filed after Plaintiff's wife, who was 22 weeks pregnant, reported that, on February 9, 2013, following an argument, she attempted to open Plaintiff's car door in order to talk to him when he speeded off, knocking her to the ground.  (See Doc. 47-4 at 59). Plaintiff's wife also reported that he (Plaintiff) had threatened to shoot a police Sergeant and get revenge on the Assistant District Attorney involved with his prior criminal case.  (Id. at 57, 59).   Soon after Plaintiff's wife reported this information, the aforementioned charges were filed against Plaintiff.  On February 14, 2013, Plaintiff was arrested.  (See Doc. 47 at 45).

On the morning of Plaintiff's arrest, around 7:00 a.m., Plaintiff called Purcell, asking her to bail him out of jail.  (Doc. 47-1 at 51, 61, 69).   Purcell declined, advising Plaintiff that she was a single mother with young children and that it would not be in her best interest.  (Id. at 61).   Purcell, in turn, contacted Stoessel to inform him that Plaintiff was in jail and not showing up to work.  (Doc. 47-2 at 59).

Around the time Plaintiff was arrested, in February 2013, Defendants' neurologists were not seeing outpatients. (See Doc. 38-9 at 3; Doc. 38-10 at 6). The PEA, though, required Plaintiff to also provide inpatient and other "required" services. (See Doc. 47-3 at 39, 40). On February 14th, Plaintiff did not attend to any patients, even after his eventual release on bail; instead, Purcell had to cover for Plaintiff by doing work that he was not there to do. (Doc. 47 at 65; Doc. 47-1 at 62). As well, another doctor helped cover Plaintiff's shift. (Doc. 47-1 at 62). Plaintiff, however, did not have to cancel any scheduled appointments. (Doc. 38-9 at 8; Doc. 47-1 at 62).

The day after Plaintiff's arrest, Attorney Doug Marsico ("Marsico"), representing Plaintiff in the criminal matter, contacted John DeLorenzo ("DeLorenzo"), Defendants' in-house legal counsel. (Doc. 47-2 at 6). Marsico informed DeLorenzo of the charges and accusations against Plaintiff. Marsico also generally expressed that Plaintiff denied the charges. (Id. at 7, 8, 14). That same day, Plaintiff came into work and, at some point, provided some information to Purcell about the incident leading to the criminal charges. (Doc. 47 at 46; see Doc. 47-1 at 63). Eventually, Plaintiff received notice that Joshi wanted to talk with him. (Doc. 47 at 46; Doc. 37 at ¶ 25). During the conversation that ensued, Joshi informed Plaintiff that he was being suspended because of the charges. (Doc. 47 at 46). Furthermore, Stoessel, who had sought advice from DeLorenzo, signed the following letter:

> We have been placed on notice that you have been charged with a series of misdemeanor crimes in Dauphin County, Pennsylvania.
>
> Please be advised that your [PEA] states in Section 4 thereof that you will abide by all Pinnacle Human Resources Policies and Procedures. Human Resources Policies and Procedures Manual # HR-6.1 addresses situations where employees are charged with criminal offences.

> Accordingly, pursuant to Policy # HR-6.1 you are hereby suspended without pay, pending a final review of the charges by Pinnacle Health.

(Doc. 47-3 at 61; see Doc. 47-2 at 61).   Kimberly Etter ("Etter"), Defendants' Director of Employment and Labor Relations, (Doc. 37 at ¶ 39), was not involved in the suspension decision even though she typically played some role in those decisions.  (Doc. 47-5 at 54).[1]

Three days after Plaintiff's suspension, on February 28, 2013, Marsico emailed the following to DeLorenzo:

> We are pursuing a complete dismissal of the charges against Dr. Q. However, the prosecuting detective has already opened the door about a resolution short of a hearing which would involve a plea to a summary offense like disorderly conduct.  I honestly do not think Dr. Q would be agreeable to that since he is adamant about his complete innocence. Nonetheless, in order to properly consider all options, and facing the economics of a trial, I certainly will discuss with him the practical aspects of paying a fine and being done with this.  In the event that an offer is made, and if Dr. Q would accept the offer for practical and economic reasons, are you able to tell me how a plea to a summary offense would affect the suspension from his employment?

(Doc. 38-27 at 3).   DeLorenzo wrote back, stating: "The Vice President that I need to discuss this with is out until mid-next week.  I will reply . . . once I have had the opportunity to discuss . . . with him.  Thanks."  (Id. at 4).  In response thereto, Marsico emailed: "I don't think he would accept a plea on a summary anyone (sic).  He just passed a polygraph.  I am submitting to the DA and asking for the charges to be withdrawn."  (Id.).

Over a month later, on April 17, 2013, a preliminary hearing was held in state court, on Plaintiff's criminal charges.  (Doc. 37 at ¶ 51).   At the close of evidence, the Commonwealth withdrew the terroristic-threat charge.  (See Doc. 47-1 at 45).  As well, the District Magistrate dismissed the remaining charges without prejudice, failing to find

---

[1]   Etters solely testified that she was not always involved in *termination* decisions involving physicians.  (Doc. 47-5 at 55-56).  She never testified, nor could it be reasonably inferred, that she did not always have involvement with decisions to *suspend* physicians who were criminally charged. (Cf. id. at 54).

probable cause.  (Id. at 46).  The District Magistrate further commented that the case was "a mess" and the Commonwealth could re-file the charges.  (Id.).  In attendance at the preliminary hearing was a representative from Defendants' outside law firm.  After the hearing concluded, this counsel reported to Defendants' in-house law department.  (Doc. 47-3 at 14).  Additionally, on May 2nd, Marsico called DeLorenzo to report that the charges against Plaintiff had been dismissed.  (See Doc. 38-26 at 5).

Following the preliminary hearing, DeLorenzo attempted to track down Plaintiff in order to obtain a statement from him about what had occurred, giving rise to the criminal charges.  (See Doc. 48-3 at 12-14).  DeLorenzo, though, was unable to reach Plaintiff.  (See id.).  Plaintiff, moreover, did not contact anyone associated with Defendants. (Doc. 47 at 54).  As a result, DeLorenzo wrote to Plaintiff on June 12, 2013, stating that Defendants had been trying to reach him regarding his employment.  (Doc. 48-3 at 77).  The letter requested Plaintiff to call, which Plaintiff immediately did, and a meeting was scheduled for June 28, 2013.  (Id.; see Doc. 47 at 54).

At the scheduled meeting, the following persons were in attendance: Plaintiff, DeLorenzo, James Bleicher ("Bleicher"), President of PHMS, and Kimberly Mask, Defendants' Director of Specialty Practices.  (Doc. 37 at ¶ 44; Doc. 47-4 at 5, 16, 45). During the meeting, Bleicher took a firm stance with Plaintiff about his level of professionalism and need to show up for work, and how his prior conduct would not be tolerated.  (See Doc. 47-4 at 22-23).  Bleicher also informed Plaintiff that the PEA had been terminated; nonetheless, there was the possibility of him returning to work under different contractual terms.  (Doc. 47-3 at 18, 35; see Doc. 47-5 at 30; see also, Doc. 37 at ¶ 56).  At

the time in question, Bleicher had authority to terminate Plaintiff's employment.  (See Doc. 38-9 at 11).

Plaintiff subsequently wrote to Bleicher and DeLorenzo, expressing a desire to return to working for Defendants.  (Doc. 38-23).  Then, on July 10, 2013, Bleicher wrote to Plaintiff formally offering a 90-day employment agreement (the "temporary agreement") with the future possibility of long-term employment.

The term of the temporary agreement was to last from July 15 to October 15, 2013.  (Doc. 47-4 at 55-63).  The temporary agreement, in comparison to the PEA, also required Plaintiff to report to the President of PHMS; offered him $833 less per month than the PEA; provided that his arrest *or* conviction for any crime could result in immediate termination of the agreement; and excluded a written-notice requirement. (Compare Doc. 47-5 at 16, 18; 19 with Doc. 47-3 at 40, 42, 43, 49).  The only way Plaintiff could have returned to working for Defendants was if he accepted the terms of the temporary agreement.  (Doc. 38-4 at 17).

After the temporary agreement was offered, DeLorenzo spoke with Plaintiff over the telephone to determine if and when Plaintiff would be returning.  (Doc. 47-3 at 30). Plaintiff advised that he was leaving the Country for a period of time and that he could not start until two months later.  (Id.).  Thereafter, on July 15, 2013, Bleicher emailed Plaintiff to ask whether he (Plaintiff) had received the new agreement, and Plaintiff replied, asserting that he was "away."  (Doc. 47-5 at 10).  The following week, on July 24th, Mask also emailed Plaintiff, notifying him that Defendants had not received a response to the new agreement he was offered.  (Id. at 12).  Plaintiff replied, stating that he would soon contact Bleicher and DeLorenzo, but did not do so.  (Id.; see Doc. 47 at 61).  DeLorenzo also

eventually learned that Plaintiff never left the Country; rather, Plaintiff was embroiled in a divorce proceeding initiated by his wife.  (See Doc. 47-3 at 33; Doc. 47-5 at 2-8).

Later, in September 2013, DeLorenzo wrote a letter to Plaintiff that, in relevant part, provided:

> As you know, currently you do not have an employment arrangement with Pinnacle Health.  Due to specific circumstances, Pinnacle is willing to provide you with a short term (three month) contract . . . .  You have requested that the dates encompass September through December.  Pinnacle is agreeable to that time frame.  We used the start date of September 17th as that is a provider orientation date and you will need to attend this session.
>
> As such, we enclose this short term contract.  Please be advised we will make no other changes to the employment documents.  Therefore, if you wish to pursue employment with Pinnacle Health this is the only course to take.
>
> . . . .
>
> Please note that this offer is only valid for five (5) days from the above date.  We would therefore ask that you return the same to us prior to this date.

(Doc. 47-5 at 14).  Enclosed with this letter was a copy of the temporary agreement.  (Id. at 15-27).  Plaintiff, who considered the terms unfavorable, did not sign the temporary agreement.  Instead, Attorney Robert Small ("Small") wrote to DeLorenzo on Plaintiff's behalf, rejecting the agreement and seeking Plaintiff's reinstatement under the PEA.  (See Doc. 38-20).

On September 12, 2013, DeLorenzo and Small corresponded via email.  DeLorenzo indicated that, pursuant to Paragraph 14(c)(4), the PEA was terminated "for cause" because Plaintiff did not show up for work and attend scheduled appointments, and the head of neurology did not consent to his absence.  (Doc. 38-21 at 5).  Furthermore,

since that email was sent to Small, and in response to data and documents requests from

the Pennsylvania Human Relations Commission ("PHRC"), Defendants have alleged:

> Action was not taken against [Plaintiff].  Rather, [Plaintiff] failed to return
> to work.  The initial action to suspend [Plaintiff] pending [Defendants']
> review of the criminal charges filed against [Plaintiff] was taken by
> [Stoessel].  []
>
> Thereafter, [Defendants] attempted to reach [Plaintiff] but was unable to
> do so.  Once [Plaintiff] was reached, a conference was held . . . on June
> 28, 2013, during which [Plaintiff] was offered continued employment . . . .
> A new contract was sent to [Plaintiff], however, despite inquiries [Plaintiff]
> neither signed the new contract nor returned to work.

(Doc. 38-22 at 2).  Also, on a Personnel Action Form, it was indicated that Plaintiff's

employment was voluntarily terminated, effective October 15, 2013.  (Doc. 53-1).  On the

same Form, it was indicated that Plaintiff's overall performance was "low" and dependability

"poor."  (Id.).

In the end, Plaintiff was never offered to return to work with Defendants

under the PEA.  As well, Plaintiff did not receive severance payments, nor did he receive

any pay or remuneration following his suspension.  (Doc. 37 at ¶¶ 89, 91; Doc. 38-1 at 2).

Furthermore, following his suspension, Plaintiff did not return to work because he was never

instructed to do so, at least not under the PEA.  (See Doc. 38-4 at 15).  By the fall of 2013,

Plaintiff signed an employment agreement to work at a hospital in Virginia.  (Doc. 47 at 52).

## II.    Legal Standard

After time for adequate discovery and upon motion, Rule 56 of the Federal

Rules of Civil Procedure provides that summary judgment is appropriate when no genuine

issue exists as to any material fact and the moving party is entitled to judgment as a matter

of law.  See Fed.R.Civ.P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48

(1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

To determine whether summary judgment is appropriate, courts rely upon cited evidence in the record, see Fed.R.Civ.P. 56(c), and view the evidence in the light most favorable to the non-moving party. *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015). At this stage, however, a court may not make credibility determinations or weigh evidence. See *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 655 (3d Cir. 2002).

"A fact is 'material' if 'proof of its existence or nonexistence would affect the outcome of the lawsuit under the law applicable to the case.'" *Militello v. Allstate Property and Casualty Ins. Co.*, No. 1:14-CV-0240, 2015 WL 7300520, at *6 (M.D. Pa. Nov. 18, 2015)(Rambo, J.)(quoting *Burke v. Transam Trucking, Inc.*, 605 F. Supp. 2d 647, 650 (2009)(Conaboy, J.)). Accordingly, substantive law will operate to identify which facts are "material." "An issue of material fact is genuine if 'the evidence is such that a reasonable jury might return a verdict for the non-moving party.'" *Id.*

"The moving party has the initial burden of proving that no genuine issue of material fact exists." *Militello, supra*, at *6 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); see *United States v. Donovan*, 661 F.3d 174, 185 (3d Cir. 2011)(explaining movant's summary-judgment burden when that party also bears the burden of proof at trial); *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007)(same); cf. *National State Bank v. Federal Reserve Bank of New York*, 979 F.2d 1579, 1581-82 (3d Cir. 1992)(explaining movant's summary-judgment burden when that party does not have the trial burden on the underlying claim). If the moving party's summary-judgment burden is satisfied, "the [summary-judgment] burden shifts to the nonmoving party to go beyond the pleadings and 'come forward with specific facts showing that there is a genuine issue for trial.'" *Santini*, 795

F.3d at 416 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); see *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006)(describing summary judgment for the non-moving party as "'put up or shut up' time").

### III.   Discussion[2]

#### A.  Breach of Contract

"Pennsylvania law requires that a plaintiff seeking to proceed with a breach of contract action must establish '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'" *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003)(quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).  In this case, there is no dispute that a contract existed between the parties, via the PEA.  Only the language of the PEA and whether Defendants breached the agreement by suspending Plaintiff without pay and eventually terminating his employment are presently at issue.

#### 1.  Plaintiff's Suspension

After his arrest in February 2013, Plaintiff was suspended without pay pursuant to HR # 6.1(E).  The suspension policy was not explicitly listed as a basis for suspension in the PEA.  The PEA did not even explicitly set forth the grounds upon which Plaintiff could be suspended; rather it spoke primarily in terms of termination from employment.  Also, there is no evidence that the PEA was subsequently amended or supplemented so as to make explicit the applicability of the suspension policy in HR # 6.1(E).  Thus, the only way Defendants could have lawfully suspended Plaintiff under

---

[2]    The Court has original jurisdiction over the remaining claims, see 28 U.S.C. § 1332, to which the parties agree that the substantive laws of Pennsylvania govern.  See also, *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *McKenna v. Pacific Rail Service*, 32 F.3d 820, 825 (3d Cir. 1994).

the policy, without breaching the agreement, was if the suspension provision was validly incorporated by reference.

"Incorporation by reference [involves] a question of law." *Camp Ne'er Too Late, LP v. Swepi, LP*, No. 4:14-CV-01715, 2016 WL 2594186, at *21 (M.D. Pa. May 5, 2016)(Brann, J.)(quoting *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1343 (Fed. Cir. 2008)).  In Pennsylvania, "incorporation by reference is proper where the underlying contract makes clear reference to a separate document, the identity of the separate document may be ascertained, and incorporation of the document will not result in surprise or hardship." *Id.* (quoting *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 761 (3d Cir. 2016)(internal quotation marks omitted)).  "[W]here incorporated matter is referred to for a specific purpose only, it becomes a part of the contract for such purpose only, and should be treated as irrelevant for all other purposes." *Capricorn Power Co., Inc. v. Siemens Westinghouse Power Corporation*, 324 F.Supp.2d 731, 750 (W.D. Pa. 2004)(quoting Williston on Contracts § 30:25 (footnote omitted)); see *Guerini Stone Co. v. P.J. Carlin Constr. Co.*, 240 U.S. 264, 277 (1916)("[A] reference by the contracting parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified.").

Here, in relevant part, Paragraph 4 of the PEA provided that Plaintiff "shall also comply with all of PHS's Human Resources Policies and Procedures."  According to Plaintiff, the quoted language is clear and unambiguous, imposing a duty on Plaintiff to "comply."  As such, Plaintiff contends that only those provisions of the HR policies and procedures with which he could "comply" were validly incorporate by reference.  (See Doc. 36 at 13, 17).  In other words, Plaintiff does not dispute that some of the HR policies and

procedures were validly incorporated. His argument hones in on the extent of, or purpose for, their incorporation. Plaintiff asserts that, since HR # 6.1(E) did not contain any provisions with which he could comply, the suspension provision was not validly incorporated by reference into the PEA and any suspension made thereunder constituted a breach.

Applying Pennsylvania law on contracts interpretation, see *American Eagle Outfitters v. Lyle & Scott, Ltd.*, 584 F.3d 575, 587-88 (3d Cir. 2009), the Court cannot find pertinent ambiguities in the PEA and agrees with Plaintiff that the language at issue is clear and unambiguous. Indeed, it is clear from the context and language utilized that the intent of Paragraph 4 was to impose a duty on Plaintiff to "comply" with, or abide by / act in accordance with, provisions of the HR policies and procedures, as required or requested therein. See *First Graphics, Inc. v. M.E.P. CAD, Inc.*, No. 00 C 2524, 2001 WL 755138, at *6 (N.D. Ill. June 29, 2001)("The Court finds that "comply," consistent with its ordinary meaning, means to act in accordance with standards or requirements."); Webster's Third New International Dictionary 3 (1981)(defining "abide by" as meaning to act or behave in accordance with, or obedience to, a rule or promise); see also, Garner on Language and Writing 174-76 (2009)(discussing use of the word "shall" and recognizing one meaning to be the imposition of a duty); accord, *Steuart v. McChesney*, 444 A.2d 659, 662 (Pa. 1982)("Courts in interpreting a contract do not assume that its language was chosen carelessly. [(Internal quotations and citation omitted).] Neither can it be assumed that the parties were ignorant of the meaning of the language employed. [(Citation omitted).].").[3] In

---

[3]     "Comply" has also been defined, in the legal sense, as meaning "to accept." Black's Law Dictionary 286 (6th ed 1990). It is obvious, though, that said usage of "comply" means something more than simply "to receive" or "to retain." See *id.* at 12 (defining "accept"). Indeed, based upon the common definition and usage of the word "comply," when the word is used to connote "to

fact, in the suspension letter sent to Plaintiff, which Stoessel signed, the following was written: "Please be advised that your [PEA] states in Section 4 thereof that you *will abide by* all [HR] policies and procedures."   (Doc. 47-3 at 61)(emphasis added).   Thus, under Paragraph 4 of the PEA, Plaintiff had a duty to act in accordance with / abide by the HR policies and procedures, as required or requested therein.

With this interpretation in mind, the Court likewise finds as a matter of law that only the provisions of the HR policies and procedures that touched on Plaintiff's conduct, enabling him to fulfill his duty to abide / act in accordance, were validly incorporated into the employment agreement.   In other words, as Plaintiff suggests, the provisions of the HR policies and procedures granting prerogatives to Defendants were not incorporated and were irrelevant.

Of course, Defendants would seem to disagree with this conclusion by arguing that Plaintiff knew, or should have known, that they interpreted the relevant language to encompass every HR policy and procedure.  (See Doc. 46 at 20).  Defendants, though, do not discuss any reasonable interpretation of the PEA giving rise to such an interpretation.   Furthermore, since the relevant language is clear and unambiguous, the Court's inquiry regarding the interpretation of the same need not go on.  See *Surovcik v. D&K Optical, Inc.*, 702 F.Supp. 1171, 1176 (M.D. Pa. 1988)(Rambo, J.)(finding a latent ambiguity before turning to a discussion about whether one of the defendant's knew or had reason to know of the plaintiff's understanding of the contract); see also, 17A C.J.S. Contracts § 398 ("*[I]n case of ambiguity*, a contract generally is given the meaning that the promisor knew, or had reason to know, was in accordance with the promisee's

_____

accept," it means that an individual "agrees to carry out," see *id.*, or act in accordance with, provisions.

18

understanding.")(emphasis added).   Also, there is nothing else in the PEA, as far as the Court is aware, which would give rise to an inference that every HR policy and procedure, even those *not* touching on Plaintiff's conduct, were validly incorporated.

Turning to HR # 6.1(E), subsection (3) touched on Plaintiff's conduct by requiring him to report the filing of criminal charges against him within 24 hours.  However, that is the sole portion of HR # 6.1(E) that required or requested anything of Plaintiff, with which he could comply.   The provision in the policy allowing for an employee to be suspended, especially as written, merely provided Defendants with a prerogative. Therefore, the Court finds as a matter of law that the suspension provision of HR # 6.1(E) was not validly incorporated by reference into the PEA.

Since the suspension provision within HR # 6.1(E) was not validly incorporated into the PEA, Plaintiff could not be suspended thereunder without a breach occurring.[4]  It is undisputed that Plaintiff was suspended pursuant to the policy's suspension provision and was not paid during the course of his suspension.  Accordingly, no juror could reasonably find in Defendants favor, and Plaintiff is entitled to judgment as a matter of law, meaning that summary judgment on this portion of the breach-of-contract claim will be granted in Plaintiff's favor.  The issue over the actual amount of damages will be left for trial.

## 2. Plaintiff's Termination

Under the terms of the PEA, Defendants could unilaterally terminate the agreement without cause by giving 180-days prior written notice of termination to Plaintiff. In its sole discretion, Defendants could also terminate Plaintiff's services during the notice period, provided that he also received severance payments.  Plaintiff claims that Defendants

---

[4]     The Court's decision should not be broadly understood as rendering inapplicable all policies of the sort; rather, this case is confined to the language in the contractual agreement between the parties.

breached the PEA by terminating his employment and services without notice and without making severance payments to him.   (See Doc. 36 at 22-27).   In the present motion, moreover, Plaintiff contends that there is no genuine issue of material fact and he is entitled to judgment as a matter of law.

Viewing the evidence in the light most favorable to Defendants and without making credibility determinations, the Court finds that a genuine issue of material fact exists with respect to Plaintiff's claim that a breach occurred when he was terminated from Defendants' employ without receiving severance payments.   In the PEA, Paragraph 14(c) provided that Defendants could terminate Plaintiff from their employ "for cause," if, *inter alia*, he breached any material term of the agreement or failed to perform his duties as a physician.   The PEA also stated that Plaintiff would "be expected, absent cause or consent by the head of neurology, to provide . . . required services during scheduled work times." (Doc. 47-3 at 40).   On the date Plaintiff was arrested in 2013, he failed to show up for work and did not have permission from any supervisor to do so.   As a result, Purcell and another doctor had to cover for Plaintiff's shift by doing some of the work that Plaintiff was not there to perform.   Moreover, that was not Plaintiff's first time missing work as a member of Defendants' medical staff, as a result of being embroiled in a domestic episode with his wife. It was also explained to Plaintiff that, in light of the prior episodes he had with his wife that caused him to miss work in 2011, he would be on a "very short leash" while working for Defendants again.   A jury, therefore, could reasonably conclude that there were grounds for "for cause" termination under the PEA.

What's more, during a meeting in June 2013, Bleicher, who had the authority to make termination decisions, took a firm stance with Plaintiff about his level of

professionalism and the need for him to show up to work. Bleicher further told Plaintiff that his prior conduct would not be tolerated and informed Plaintiff that the PEA had been terminated. In light of Bleicher's discussion with Plaintiff during said meeting, a jury could reasonably infer that Bleicher was aware of Plaintiff's prior dealings with Defendants and the reason behind, or cause of, his absence in February 2013, resulting in a decision to terminate Plaintiff's employment "for cause" and without the necessity to make severance payments to him.

In this respect, there are genuine issues of material fact for trial, and Plaintiff's motion for summary judgment will be denied.[5]

Regarding the remaining portion of Plaintiff's breach-of-contract claim, i.e., that a breach occurred when he was not provided with written notice before his employment and services were terminated, it is undeniable that Plaintiff's employment and services were not terminated for a reason listed in Paragraphs 14(a) or (b). Moreover, the express language of the PEA clearly required written notice in the event that the PEA was terminated without cause under Paragraph 14(d). Thus, if a jury were to find that Plaintiff was terminated without cause, a breach would have occurred given that Plaintiff was not provided with any written notice. The same result, however, might not be warranted if a jury found that Plaintiff's termination was "for cause," for a reason listed in Paragraph 14(c)(1) thru (4).

---

[5]     Since there are genuine issues of material fact about whether Plaintiff was terminated "without cause" entitling him to receive severance payments, the Court will deny Plaintiff's motion with respect to his claim arising under the WPCL. See *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir. 2003)("[T]he WPCL does not create a right to compensation . . . . Rather, it provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages.")(internal quotations and citation omitted); see also, *Bowers v. NETI Tech., Inc.*, 690 F.Supp. 349 (E.D. Pa. 1988)(severance pay and option to sell back stock options covered under WPCL definition of "wages").

To that end, the Court finds that the PEA is ambiguous with respect to the written-notice requirement.  (See Doc. 47-3 at 43).  Indeed, the PEA could be reasonably interpreted as requiring written notice when any of the "for cause" termination provisions were triggered.  Alternatively, the agreement could be reasonably interpreted as solely requiring written notice if Plaintiff failed to "attain assigned objectives."

While Pennsylvania law provides that "any ambiguous language in a contract is construed against the drafter and in favor of the other party if the latter's interpretation is reasonable," *Sun Co., Inc. (R&M) v. Pennsylvania Turnpike Commission*, 708 A.2d 875, 878-79 (Pa. Cmwlth. Ct. 1998)(citing Restatement (Second) of Contracts § 206; *State Public School Building Authority v. Quandel*, 585 A.2d 1136 (1991)); see *Rusiski v. Pribonic*, 515 A.2d 507, 510 (Pa. 1986)("[D]oubtful language is construed most strongly against the drafter thereof."), the Supreme Court of Pennsylvania has also advised that this rule of construction "is not intended as a talismanic solution to the construction of ambiguous language." *Burns Mfg. Co., Inc. v. Boehm*, 356 A.2d 763, 766 n. 3 (Pa. 1976).  Thus, "[w]here a document is found to be ambiguous, inquiry should always be made into the circumstances surrounding the execution of the document in an effort to clarify the meaning that the parties sought to express in the language in which they chose." *Id.* (citations omitted).  "It is only when such an inquiry fails to clarify the ambiguity that th[is] rule of construction . . . should be used to conclude the matter against that party responsible for the ambiguity, the drafter of the document." *Id.* (citing A. Corbin, Corbin on Contracts, § 559 (one vol. ed. 1953; Restatement of Contracts § 236(d) (1932)).  In this sense, the factfinder should first be given the opportunity to attempt to resolve the ambiguity based on the facts involving the execution of the PEA.  If the factfinder is unable to resolve the ambiguity because the

evidence fails to provide clarity, then the language in the PEA would need to be construed against Defendants, likely resulting in a judgment for Plaintiff.

In sum, since it is unclear (i) whether Plaintiff was terminated "without cause," entitling him to severance payments and (ii) whether a termination "for cause," for a reason stated in Paragraph 14(c)(1) thru (4), required written notice, the Court will also deny Plaintiff's summary-judgment motion on his claim that a breach occurred when he was terminated from Defendants' employ without notice.

IV.    *Conclusion*

Plaintiff's motion for summary judgment will be granted in part and denied in part.  Plaintiff's motion will be granted with respect to his claim that a breach of contract occurred when he was suspended from Defendants' employ without pay.  Plaintiff's motion will be denied in all other respects.  An appropriate Order will follow.

<u>/s/ William W. Caldwell</u>
William W. Caldwell
United States District Judge

**Date Filed**: July 11, 2016

23